## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| SEEPERSAUD SUROOJ and KOWSILLA SUROOJ, Individually and On Behalf of All Others Similarly Situated, | Case No.: |
| Plaintiffs, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| POLARIS INDUSTRIES, INC., SCOTT W. WINE, and MICHAEL T. SPEETZEN, | **<u>JURY TRIAL DEMANDED</u>** |
| Defendants. | |

Plaintiffs Seepersaud and Kowsilla Surooj ("Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Polaris Industries, Inc., ("Polaris" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Fiat; and (c) review of other publicly available information concerning Fiat.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that acquired Polaris and its predecessor companies' securities between February 20, 2015, and September 11, 2016 (the "Class Period"), against the Defendants, seeking to remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Polaris and its subsidiaries design, engineer, manufacture, and market off-road vehicles, snowmobiles, motorcycles, and other vehicles for sale in the United States, Canada, Western Europe, Australia, and Mexico.

3.      Since at least July 2015 Polaris has issued several recall notices for its RZR and ROV brand off-road vehicles due to fire hazards: :

   o On July 23, 2015, the Company issued a recall for roughly 4,300 RZR off-road vehicles that were subject to a fire hazard.

   o On October 5, 2015, the Company issued a voluntary recall on model year 2015 Polaris RZR 900 and 1000 vehicles due to reports of pinched fuel tank vent lines that posed a potential fire hazard.

   o On December 10, 2015, the Company issued a recall on RZR XP Turbo off-road vehicles, instructing riders to "immediately stop

using the recalled vehicles and contact their local Polaris dealer," due to a leaky oil drain that posed a fire hazard.

o  On April 19, 2016, the Company issued a recall on certain RZR 900 and 1000 off-road vehicles manufactured since model year 2013 due to reports of fires.

o  On June 28, 2016, the Company issued a recall on its Ranger 570 ROVs due to a fire hazard, instructing riders to stop using the vehicles immediately.

o  On July 25, 2016, the Company issued a recall for its MY2016 RZR Turbo models due to fire hazard, instructing riders to stop using the vehicles immediately.

o  On September 1, 2016, the Company issued a recall on its RZR Turbo ROVs due to a fire hazard.

o  On September 15, 2016, the Company issued a recall on its Ranger ROVs due to fire hazards and instructed riders to stop using the vehicles immediately.

4.    In all, the recalls affected over 160,000 vehicles.  According to news reports, in one instance a 15-year old rider was killed after his Polaris off-road vehicle burst into flames.

5.    Throughout the Class Period Defendants made materially false and misleading statements regarding the Company's business, operational, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) a material amount of Polaris vehicles were subject to a safety recall that would degrade the Polaris brand; (2) the safety recalls would subject to the Company to large potential liabilities, including an expensive and complicated repair process as well as loss of goodwill; (3) the recalls jeopardized the Company's future revenues and profitability; (4) the Company overstated its full-year 2016 guidance; and (5) as a result

of the foregoing, Defendants' statements about Polaris's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

6.    On September 12, 2016, Polaris issued a press release revising down its full year 2016 guidance due to rising expenses and lowered expected revenues. The Company stated in relevant part:

> "[T]he Company [expects] full-year 2016 earnings to be in the range of $3.30 to $3.80 per diluted share, $2.50 to $2.70 per diluted share lower than previously expected of which approximately two-thirds is expected to be incurred in the third quarter. Polaris also expects total Company sales for the full-year 2016 to be down in the mid to high-single digit percent range compared to previously issued guidance of flat to down two percent. Since Polaris last updated its full year guidance and hosted its investor day in July, the Company has experienced additional RZR thermal-related issues and was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution. As a result, the voluntary stop ride/stop sale notification issued on July 25, 2016 remained in place significantly longer than originally anticipated, delaying any sales of the highly-requested RZR Turbo vehicle. Also, given the additional RZR thermal issues, the Company revalidated many of its recently introduced model year 2017 ORV products, causing a delay in shipments of those vehicles. The Company believes its model year 2017 products and the more aggressive programs it has planned for the second half of 2016 will have a positive impact on Off-Road Vehicle ('ORV') sales. However, given the delayed model year 2017 shipments and additional recall activity, the expected positive impact will be deferred later than the Company had originally estimated."

7.    On this news, Polaris stock fell $4.05, or 5.01%, to close at $76.79 on September 12, 2016.

8.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, as Polaris is headquartered in this District.

12.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.    Plaintiffs, as set forth in the accompanying certification, incorporated by reference herein, purchased Polaris common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant Polaris is incorporated in Minnesota, and the Company's principal executive offices are located at 2100 Highway 55, Medina, Minnesota 55340. Polaris's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "PII."

15.    Defendant Scott W. Wine ("Wine") has served at all relevant times as the Company's Chief Executive Officer and Chairman, and as a member of the Company's Technology Committee.

16.    Defendant Michael T. Speetzen ("Speetzen") has served at all relevant times as the Company's Chief Financial Officer and Executive Vice President of Finance.

17.    Defendants Wine and Speetzen (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Polaris's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading
### Statements Issued During the Class Period

18.    The Class Period begins on February 20, 2015. On that day the Company filed its annual report for the period that ended December 31, 2014. Therein, the Company reported record sales and net income, including over $2.9 billion in Off-Road vehicle sales and positive trends in its RZR brand vehicles. Polaris stated in relevant part:

> "In 2014, we had record sales and net income, with our fifth straight year of double digit growth in both sales and net income. This growth is fueled by award-winning innovative new products leading to continued market share

leadership in side-by-side vehicles and ATVs. In 2014, we also experienced growth in our snowmobiles, motorcycles, international and small vehicles businesses. The overall North American powersports industry continued its positive trend with mid-single digit percentage growth in 2014. Our North America retail sales to consumers increased 12 percent in 2014, helping to drive total full year Company sales up 19 percent to a record $4.48 billion. Despite the global economy remaining difficult, our international sales increased 16 percent due to continued market share growth in all product categories and strong results by our recent European acquisitions."

19.    On April 30, 2015, the Company filed a quarterly report for the period that ended March 31, 2015. The Company reported Off-Road vehicle sales of $645.4 million and stated:

"We reported net income of $88.6 million, or $1.30 per diluted share, an earnings per diluted share increase of nine percent compared to 2014 first quarter net income of $80.9 million, or $1.19 per diluted share. Sales totaled $1,033.3 million, an increase of 16 percent from last year's first quarter sales of $888.3 million. The sales increase was driven primarily by increased sales of ORVs, motorcycles and PG&A, improved pricing and beneficial mix. Our unit retail sales to consumers in North America grew eight percent in the first quarter of 2015, with the increased demand primarily of ORVs and motorcycles. Our sales to customers outside of North America declined seven percent driven by lower sales in ORVs and motorcycles, due to a decline in sales in the Europe, Middle East and Africa ("EMEA") region of 15 percent, offset by a 75 percent increase in Latin American sales and a six percent increase in sales in the Asia/Pacific region. Our gross profit of $293.7 million increased 14 percent from $258.4 million in the comparable prior year period. The increase in gross profit resulted primarily from higher volume, increased selling prices and continued product cost reduction efforts, partially offset by negative currency impacts and unfavorable mix. Our liquidity remained healthy with $111.0 million of cash on hand and $408.3 million of availability on our revolving loan facility at March 31, 2015."

20.    On July 24, 2015, the Company filed a quarterly report for the period that ended June 30, 2015. The Company reported Off-Road vehicle sales of $688.8 million and stated:

"We reported net income of $100.9 million, or $1.49 per diluted share, an earnings per diluted share increase of five percent compared to 2014 second quarter net income of $96.9 million, or $1.42 per diluted share. Sales totaled $1,124.3 million, an increase of eleven percent from last year's second quarter sales of $1,014.0 million. The sales increase was driven primarily by increased sales of ORVs, snowmobiles, motorcycles and PG&A, improved pricing and beneficial mix partially offset by unfavorable currencies. Our unit retail sales to consumers in North America grew eleven percent in the second quarter of 2015, with the increased demand primarily for ORVs and motorcycles. Our sales to customers outside of North America decreased four percent driven by 12 percent lower sales in the Europe, Middle East and Africa ("EMEA") region, partially offset by a 32 percent increase in Latin American sales and a 15 percent increase in sales in the Asia/Pacific region. Our gross profit of $319.4 million increased five percent from $304.9 million in the comparable prior year period. The increase in gross profit resulted primarily from higher volume, increased selling prices and continued product cost reduction efforts, partially offset by negative currency impacts, higher promotional spending, and approximately $9.0 million of additional manufacturing costs and inefficiencies, as we worked to scale-up production and add capacity to the paint system at our motorcycle facility in Spirit Lake, Iowa. Our liquidity remained healthy with $118.8 million of cash on hand and $335.6 million of availability on our revolving loan facility at June 30, 2015."

21.    On October 27, 2015, the Company filed a quarterly report for the period that ended September 30, 2015. The Company reported Off-Road vehicle sales of $822.9 million and stated:

"We reported net income of $155.2 million, or $2.30 per diluted share, an earnings per diluted share increase of 12 percent compared to 2014 third quarter net income of $140.8 million, or $2.06 per diluted share. Sales totaled $1,456.0 million, an increase of 12 percent from last year's third quarter sales of $1,302.3 million . The sales increase was driven primarily by increased sales in all product lines, improved pricing and beneficial mix, partially offset by unfavorable currencies. Our unit retail sales to consumers in North America grew seven percent in the third quarter of 2015, with the increased demand primarily for ORVs and motorcycles. Our sales to customers outside of North America increased one percent, driven by a 50 percent increase in Latin American sales, partially offset by four percent lower sales in the Europe, Middle East and Africa ("EMEA") region and a one percent decrease in sales in the Asia/Pacific region. Our gross profit of

$415.6 million increased seven percent from $388.3 million in the comparable prior year period. The increase in gross profit resulted primarily from higher volume, increased selling prices and continued product cost reduction efforts, partially offset by negative currency impacts and higher promotional spending. Our liquidity remained healthy with $225.3 million of cash on hand and $422.8 million of availability on our revolving loan facility at September 30, 2015."

22.    On February 19, 2016, the Company filed its annual report for the period that ended December 31, 2015. Therein, the Company reported record sales and net income, including over $3.7 billion in Off-Road vehicle/Snowmobile sales and positive trends in its RZR brand vehicles. Polaris stated in relevant part:

"In 2015, we had record sales and net income, with our sixth straight year of growth in both sales and earnings per share. This growth was fueled by award-winning innovative new products leading to continued market share leadership in side-by-side vehicles and ATVs. The overall North American powersports industry was approximately flat in 2015. Our North America retail sales to consumers increased five percent in 2015, helping to drive total full year Company sales up five percent to a record $4.72 billion. With the global economy remaining challenged, and the U.S. dollar strengthening, our international sales decreased five percent due to continued volatility in the currency markets.

Full year net income of $455.4 million was approximately flat with 2014, reflecting the success of continued product innovation, offset by negative currencies of approximately $70.0 million, or $0.55 per diluted share, with diluted earnings per share from continuing operations increasing two percent to a record $6.75 per share. While 2015 results were below expectations, we continued to invest in numerous longer-term diversification and growth opportunities.

In 2015, product innovation remained our top priority. We introduced over twenty new ORV models in 2015, including the all-new RZR ® XP 1000 Turbo and the all-new Polaris GENERAL ™ 1000. We also added to the iconic Indian Motorcycle ® line-up with the introduction of the all-new Indian Scout Sixty ™ , a 999cc premium motorcycle. Within snowmobiles, we expanded the award winning AXYS ® platform into seven new model year 2016 RMK ® mountain sled models. We also acquired the electric motorcycle business of Brammo, Hammerhead Off-Road ® in China,

Timbersled ™, and 509. Operationally, we expanded production capacity and capabilities with the purchase of a paint facility in Spearfish, South Dakota."

23.     On April 29, 2016, the Company filed a quarterly report for the period that ended March 31, 2016. The Company reported Off-Road vehicle sales of $720.6 million and stated:

"We reported net income of $46.9 million, or $0.71 per diluted share, an earnings per diluted share decrease of 45 percent compared to 2015 first quarter net income of $88.6 million, or $1.30 per diluted share. Sales totaled $983.0 million, a decrease of five percent from last year's first quarter sales of $1,033.3 million. The sales decrease was driven by lower shipments of off-road vehicles, unfavorable mix and unfavorable currencies. This decrease was partially offset by increased sales of motorcycles. Our unit retail sales to consumers in North America grew six percent in the first quarter of 2016, with the increased demand primarily for snowmobiles and motorcycles. Our sales to customers outside of North America increased six percent, driven by a 29 percent increase in Latin American sales and a six percent sales increase in the Europe, Middle East and Africa ("EMEA") region, partially offset by a seven percent decrease in sales in the Asia/Pacific region. Our gross profit of $247.6 million decreased 16 percent from $293.7 million in the comparable prior year period. The decrease in gross profit resulted primarily from lower volume, negative product mix, negative currency impacts, and increased promotional and warranty costs, partially offset by lower commodity costs and cost savings from product cost reduction efforts. Our liquidity remained healthy with $145.8 million of cash on hand and $202.3 million of availability on our revolving loan facility at March 31, 2016."

24.     On July 22, 2016, the Company filed a quarterly report for the period that ended June 30, 2016. The Company reported Off-Road vehicle sales of $808.5 million and stated:

"We reported net income of $71.2 million, or $1.09 per diluted share, an earnings per diluted share decrease of 27 percent compared to 2015 second quarter net income of $100.9 million, or $1.49 per diluted share. Sales totaled $1,130.8 million, an increase of one percent from last year's second quarter sales of $1,124.3 million. The sales increase was driven by higher shipments of motorcycles, partially offset by lower shipments of ORV units. Our unit retail sales to consumers in North America decreased seven

percent in the second quarter of 2016, with decreased demand for off-road vehicles. Our sales to customers outside of North America increased five percent, driven by a 41 percent increase in Latin American sales and a six percent sales increase in the Europe, Middle East and Africa ("EMEA") region, partially offset by a 14 percent decrease in sales in the Asia/Pacific region. Our gross profit of $284.5 million decreased 11 percent from $319.4 million in the comparable prior year period. The decrease in gross profit resulted primarily from lower volume, negative product mix, negative currency impacts, and increased promotional and warranty costs, partially offset by lower commodity costs and cost savings from product cost reduction efforts. Our liquidity remained healthy with $146.6 million of cash on hand and $863.6 million of combined availability, inclusive of both the revolving loan facility and the delayed draw term loan facility at June 30, 2016."

25.     The statements in ¶¶18-24 were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. Throughout the Class Period Defendants made materially false and/or misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) a material amount of Polaris vehicles were subject to a safety recall that would degrade the Polaris brand; (2) the safety recalls would subject to the Company to large potential liabilities, including an expensive and complicated repair process as well as loss of goodwill; (3) the recalls jeopardized the Company's future revenues and profitability; (4) the Company overstated its full-year 2016 guidance; and (5) as a result of the foregoing, Defendants' statements about Polaris's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

**<u>Disclosures at the End of the Class Period</u>**

26.     On September 12, 2016, Polaris announced to investors that it would revise down its 2016 full year guidance, stating in relevant part:

"The Company now expects full-year 2016 earnings to be in the range of $3.30 to $3.80 per diluted share, $2.50 to $2.70 per diluted share lower

than previously expected of which approximately two-thirds is expected to be incurred in the third quarter. Polaris also expects total Company sales for the full-year 2016 to be down in the mid to high-single digit percent range compared to previously issued guidance of flat to down two percent.

Since Polaris last updated its full year guidance and hosted its investor day in July, the Company has experienced additional RZR thermal-related issues and was unable to sufficiently validate the initially identified RZR Turbo recall repair, necessitating a more complex and expensive repair solution. As a result, the voluntary stop ride/stop sale notification issued on July 25, 2016 remained in place significantly longer than originally anticipated, delaying any sales of the highly-requested RZR Turbo vehicle. Also, given the additional RZR thermal issues, the Company revalidated many of its recently introduced model year 2017 ORV products, causing a delay in shipments of those vehicles. The Company believes its model year 2017 products and the more aggressive programs it has planned for the second half of 2016 will have a positive impact on Off-Road Vehicle ('ORV') sales. However, given the delayed model year 2017 shipments and additional recall activity, the expected positive impact will be deferred later than the Company had originally estimated.

The earnings revision of $2.50 to $2.70 per diluted share can be summarized as follows: approximately half is related to the margin impact from delayed model year 2017 shipments, including the high margin RZR Turbo vehicles, as the Company revalidated its new model line-up and protects dealer inventory levels, along with correspondingly lower sales of the Company's high-margin Parts, Garments and Accessories ('PG&A') business; and about 25 percent is the result of higher promotional and customer appreciation costs to rebuild confidence and credibility with RZR owners. The remaining 25 percent is primarily related to expediting the product recall repairs, including the recently announced RZR Turbo recall which, when combined with the one-time warranty, legal and acquisition related costs recorded in the first half of 2016, totals approximately $120 million, or about $1.20 per diluted share of costs that should be considered non-recurring in 2017."

27.    On this news shares of Polaris fell $4.05, or 5.01%, to close at $76.79 on September 12, 2016, on volume of over 8.9 million shares.

## CLASS ACTION ALLEGATIONS

28.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons and entities that acquired Polaris securities between February 20, 2015, and September 11, 2016, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Polaris's common stock actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds of thousands of members in the proposed Class. Millions of Polaris shares were traded publicly during the Class Period on the NYSE.  As of February 12, 2016, the Company had 64,956,308 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Polaris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

32.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Polaris; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

### UNDISCLOSED ADVERSE FACTS

34.    The market for Polaris's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Polaris's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Polaris securities relying upon the integrity of the market price of the Company's securities and market information relating to Polaris, and have been damaged thereby.

35.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Polaris's securities by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose

material adverse information and/or misrepresented the truth about Polaris's business, operations, and prospects as alleged herein.

36.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period Defendants made or caused to be made a series of materially false and/or misleading statements about Polaris's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

38.    During the Class Period Plaintiffs and the Class purchased Polaris's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly and

substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein, Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Polaris, their control, receipt, and modifications of Polaris's materially misleading misstatements, and their positions with the Company which made them privy to confidential proprietary information concerning Polaris, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

40.    The market for Polaris's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and failures to disclose, Polaris's securities traded at artificially inflated prices during the Class Period. On February 26, 2015, the Company's stock price closed at a Class Period high of $157.62 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Polaris's securities and market information relating to Polaris, and have been damaged thereby.

41.    During the Class Period, the artificial inflation of Polaris's stock was caused by the material misrepresentations and omissions particularized in this Complaint, causing the damages sustained by Plaintiffs and other members of the Class. During the Class Period Defendants made or caused to be made a series of materially false and misleading statements about Polaris's business, prospects, and operations. These material misstatements and omissions created an unrealistically positive assessment of Polaris and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing

the Company's securities at such artificially inflated prices and each of them has been damaged as a result.

42.    At all relevant times, the market for Polaris's securities was an efficient market for the following reasons, among others:

(a)    Polaris stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Polaris filed periodic public reports with the SEC and/or the NYSE;

(c)    Polaris regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)    Polaris was followed by securities analysts employed by brokerage firms who wrote reports about the Company and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43.    As a result of the foregoing, the market for Polaris's securities promptly digested current information regarding Polaris from all publicly available sources and reflected such information in Polaris's stock price. Under these circumstances, all purchasers of Polaris securities during the Class Period suffered similar injury through their purchase of Polaris securities at artificially inflated prices and a presumption of reliance applies.

44.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and omissions. Because this action involves

Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

45.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

46.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Polaris who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

47.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

48.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Polaris securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth herein.

49.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Polaris's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

50.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Polaris's financial well-being and prospects, as specified herein.

51.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information. Defendants engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Polaris's value, performance, and continued substantial growth, which included the

making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Polaris and its business operations and future prospects in light of the circumstances under which they were made not misleading, as set forth more particularly herein. Defendants engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

52.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

53.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Polaris's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements

and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

54.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Polaris's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the securities trades, and in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Polaris's securities during the Class Period at artificially high prices and were damaged thereby.

55.    At the time of said misrepresentations and omissions Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Polaris was experiencing, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Polaris securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

56.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

57.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

58.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

59.     Individual Defendants acted as controlling persons of Polaris within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

60.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

61.     As set forth above, Polaris and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants'

wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:  October 24, 2016                    Respectfully submitted,

                                           **ZIMMERMAN REED, LLP**

                                           _/s/ Carolyn G. Anderson_

                                           Carolyn G. Anderson (MN No. 275712)
                                           June P. Hoidal (MN No. 033330X)
                                           Devon C. Holstad (MN No. 0398107)
                                           1100 IDS Center
                                           80 South 8th Street
                                           Minneapolis, Minnesota 55402
                                           Tel:  (612) 341-0400
                                           Fax:  (612) 341-0844
                                           Carolyn.Anderson@zimmreed.com
                                           June.Hoidal@zimmreed.com
                                           Devon.Holstad@zimmreed.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (CA Bar. No. 134180)
Robert V. Prongay (CA Bar. No. 270796)
Lesley F. Portnoy (CA Bar. No. 304851)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Tel:  (310) 201-9150
Fax:  (310) 201-9160
lglancy@glancylaw.com
RProngay@glancylaw.com
lportnoy@glancylaw.com

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith (PA Bar. No. 78078)
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Tel: (215) 638-4847
Fax: (215) 638-4867
howardsmith@howardsmithlaw.com

*Attorneys for Plaintiffs*